# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

KEVIN SHIEL,

      Plaintiff,                         :

      v.                             :       Case No.:_____

COOLFRAMES, LLC               :
COOLFRAMES, INC.                  COMPLAINT
DAVID WEISSMAN,            :
LEE WEISSMAN, and
RENATA WEISSMAN,          :

                                   JURY TRIAL DEMANDED

      Defendants.               :

Plaintiff Kevin Shiel ("Mr. Shiel" or "Plaintiff"), by and through his attorneys, Quainton Law, PLLC, as and for his Complaint against Defendants CoolFrames, LLC, CoolFrames, Inc. (collectively "CoolFrames" or the "Company"), David Weissman ("David"), Lee Weissman ("Lee") and Renata Weissman ("Renata"), alleges and states as follows:

## **INTRODUCTION**

1.    This is federal RICO, computer fraud, and common law fraud and breach of contract action resulting from Defendants' scheme to steal and misappropriate the funds and online marketing skills of Plaintiff, a highly successful 31-year old Canadian Internet entrepreneur.

2.    Defendants David and Lee own and operate an eyeglass shop doing business as Ocean Eyes Optical ("Ocean Eyes") located at 2907 Ocean Avenue, Brooklyn NY, 11235.

3.    Defendants David and Lee were, until December 2014, engaged in a business relationship with Michael Shmulenson ("Michael"), who was the owner of the domain name,

website, software code, and associated intellectual property ("IP") of an online retailer of eyeglasses named CoolFrames.com.

4.     Defendant David, on information and belief, acting on behalf of and with the knowledge and approval of Lee, and Renata, promised Plaintiff that he would receive an "equal" 50% ownership in a company to be formed and named CoolFrames LLC, along with a 33% profits interest in this Company, if Plaintiff agreed to purchase the CoolFrames.com website and associated IP from Michael for $250,000.

5.     These promises were false when made and were designed to steal $250,000 from Plaintiff, along with the CoolFrames.com domain name, website, and IP, and induce him to build a successful business for which the Defendants would profit at his expense.

6.     Plaintiff accepted Defendants' offer and, in reliance on their promises, purchased the CoolFrames.com domain name, website, and associated IP from Michael, and invested thousands of hours of his time into growing the CoolFrames.com website - **which accounts for well over 95% of the Company's revenue** – into a highly successful, highly profitable business.

7.     Almost single-handedly, Plaintiff transformed the CoolFrames.com website from a struggling online retailer that was earning less than $3,000 per day in revenue in 2014 to a thriving enterprise making daily sales of on average over $13,000 as of January 2019, with a net profit margin believed to exceed 20%.

8.     As the Company became more and more successful and profitable, Defendants David and Lee deliberately cut Plaintiff out from his share of the profits of the business, depriving him of at least many hundreds of thousands of (and possibly several million) dollars, in money owed to him.

9. Defendants David and Lee, with the full knowledge and assistance of Renata, an experienced corporate attorney, surreptitiously changed the form of the Company from an LLC to a subchapter S Corporation so that Plaintiff would be stripped of any equity interest, since non-U.S. residents cannot own equity in S Corporations.

10. In addition to systematically depriving him of the profits of the business, and deviously changing the corporate structure of the Company, once Plaintiff had sufficiently grown the Company's business, and hired and trained staff and consultants so that the business could operate independently of him, Defendants tricked Plaintiff into providing them full and unlimited access to the CoolFrames website and associated IP, claiming that the site was in danger of being "hacked" due to a security breach and needed to be evaluated and protected by an on-line security firm.

11. However, as soon as they had obtained access to all of Plaintiff's accounts, Defendants locked Plaintiff out of the CoolFrames site so that he could no longer access it from any of his computers or other devices, and stopped making even the grossly understated payments they had been making previously. Since December 2018, Defendants have made no payments whatsoever to Plaintiff.

12. Defendants' scheme has been characterized by bad faith, deception, and outright fraud. To mask their theft and misappropriation of funds belonging to Plaintiff, Defendants have engaged in a pattern of fraudulent communications and fraudulent money transfers through the instrumentalities of interstate commerce.

13. In essence, Defendants have used a legitimate and highly profitable on-line retail business as a scheme to steal from Plaintiff, with repeated fraudulent behavior across state lines and misuse of Plaintiff's computer and electronic equipment and data. As a result, in addition to

their common law liability under state law, Defendants are also liable under U.S.C. § 1962 et seq., the Racketeering Influenced and Corrupt Organizations Act ("RICO"), the Computer Fraud and Abuse Act, 18 U.S.C.A. § 1030 and the Stored Communications Act, 18 U.S.C.A. § 2701.

## PARTIES, JURISDICTION AND VENUE

14. Plaintiff Kevin Shiel is a 31-year old citizen of Canada who resides at 212 Aspen Vista Place, Calgary, Alberta T3H0Y7. Mr. Shiel has been a pathbreaking Internet entrepreneur and has built several highly successful online businesses. Mr. Shiel excels in constructing, developing and operating online properties with a compelling and enticing "look and feel," and has an uncanny ability to attract and retain on-line customers.

15. CoolFrames, Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 2907 Ocean Avenue, Brooklyn, New York 11235. CoolFrames, Inc. is the successor to CoolFrames, LLC, a limited liability company organized under the laws of the State of New York, with its principal place of business at the same location as CoolFrames, Inc. CoolFrames Inc. has succeeded to the liabilities and obligations of CoolFrames, LLC.

16. David Weissman is one of the founders of CoolFrames, LLC and one of the current owners of CoolFrames, Inc. David resides at 155 Norfolk Street, Brooklyn, NY 11235.

17. Lee Weissman is David Weissman's brother and is one of the current owners of CoolFrames, Inc. Lee resides at 108 Janwich Drive, Morganville, New Jersey 07751.

18. Renata Weissmann is David's wife and an attorney who has acted on behalf of CoolFrames, who also resides at 155 Norfolk Street, Brooklyn NY 11235.

19. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 et seq., the Computer

4

Fraud and Abuse Act, 18 U.S.C.A. § 1030, and the Stored Communications Act, 18 U.S.C.A. § 2701.

20.     In addition, this Court has jurisdiction over the subject matter of the other claims asserted herein pursuant to 28 U.S.C. §1332 based on the complete diversity of the parties and an amount in controversy in excess of $75,000.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Eastern District is the District where one or more of the Defendants reside and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## GENERAL ALLEGATIONS

## <u>MR. SHIEL'S BACKGROUND</u>

22.     Mr. Shiel is a self-taught Internet entrepreneur.

23.     After his Mother's untimely death from cancer, Mr. Shiel dropped out of middle school and began creating websites and marketing products online.

24.     At the age of 14, Mr. Shiel created one of the first video streaming platforms in the world (predating YouTube, Facebook, and Twitter).  The platform ultimately attracted millions of unique users per month and built a subscriber base of tens of thousands of active paying members. By 2014, when he was in his mid-twenties, Mr. Shiel achieved a level of success and online fame few achieve in their lifetimes and was well-known in the online marketing world as a pioneer and visionary.

25.     However, because he had achieved his success without any formal education beyond the early years of middle school, and exclusively through the rough and tumble of Internet marketing, Mr. Shiel lacked traditional business and commercial experience and was eager to partner with an established business person who he believed could act as a mentor.

Unknowingly, he would also become a target of unscrupulous businesspeople who sought to profit from his unusual combination of wealth, Internet marketing skill, and commercial naïveté.

## DEFENDANTS FORM THEIR RACKETEERING SCHEME

26.     Plaintiff first met David at a social event in late April, 2014.   David was familiar with Plaintiff's success and immediately sensed that Mr. Shiel would be an easy "mark."

27.     For his part, Mr. Shiel was impressed with David's relative "gravitas" and began to consider the possibility of partnering with David in some capacity.

28.     At that time, David was engaged in a partnership with an entrepreneur named Michael Shmulenson.  Michael owned the CoolFrames.com website and its associated intellectual property, while David owned the bricks and mortar retailer, Ocean Eyes, in Brooklyn.  The sales Michael generated were filled through Ocean Eyes, which David owned jointly with his brother, Lee.  However, CoolFrames and Ocean Eyes were both struggling and David and Michael disagreed over strategy and business development.  David began exploring the possibility of buying out Michael and eliminating him as a partner, but lacked the cash to do so himself.  David also lacked the know-how necessary to develop, grow and operate a profitable e-commerce website.

29.     In the months after David met Plaintiff, David, Renata and Lee formed a scheme to swindle Mr. Shiel out of a quarter-million-dollars, acquire the ownership of CoolFrames IP, and exploit Mr. Shiel's marketing genius for their own benefit.

30.     The scheme was simple: Defendants would pretend to offer Mr. Shiel a 50% ownership stake and a 33% profits interest in a new entity to be created, later called CoolFrames LLC, in exchange for Mr. Shiel purchasing the CoolFrames.com domain name, website, and associated IP from Michael for $250,000 and developing the online business, but would structure

the venture so that Plaintiff had no ownership interest in the Company or the CoolFrames IP, and would retain accounting control over the Company's books so that they could manipulate the company's profits, avoid all but token payments to Plaintiff and eventually freeze Plaintiff out of the business entirely.

31.     The scheme was facilitated by the geographical distance between the parties and the functional separation of their roles: Mr. Shiel was physically located in Canada and would be responsible for all operational aspects of the online business, including marketing and sales, while Defendants were located in Brooklyn, New York, and were responsible for fulfilling orders generated by Plaintiff and maintaining all necessary books and accounts. In addition, because David's wife, Renata, was an attorney, and the Company's accountants were under the control of David, Lee and Renata, the scheme could be documented to mask its sham nature.

**DEFENDANTS IMPLEMENT THEIR RACKETEERING SCHEME**

32.     In early November 2014, David formally proposed to Mr. Shiel that Plaintiff "buy out" Michael, and partner with David in Michael's place. David's offer was set forth in writing in an email to Plaintiff and in subsequent telephone conversations.

33.     Under this proposed arrangement, Plaintiff would pay Michael $250,000 in exchange for the CoolFrames.com domain name, website, and all associated IP. Mr. Shiel would retain ownership of the domain name, website, and CoolFrames intellectual property, while David would maintain his ownership of Ocean Eyes with his brother, Lee. Plaintiff and David would each then own 50% of the membership interests in a new limited liability company called CoolFrames LLC and the profits of the business would be divided equally between Plaintiff, David and Lee. David and Lee would be entitled to 100% of the profits of Ocean Eyes. The

new business would rely solely on Plaintiff to run its operations, spearhead growth and bring the Company to sustainable profitability.

34.     David expressly offered Plaintiff, in writing, to be an "equal owner" with him of a company to be formed, which would be CoolFrames, LLC.  In subsequent conversations, David and Lee offered to share all profits of the business on a 33% basis to each of Plaintiff, David and Lee.

35.     Under the previous arrangement between David and Michael, Michael received a commission of 5% of net revenue up to $85,000 per month, and 10% of net revenue above $85,000 per month generated by the online business (in addition to owning the CoolFrames website and IP).   David and Lee proposed simplifying the payment structure and offered Plaintiff a 33% profits share of all profits generated by the online business, representing to Plaintiff that this would work out more advantageously for him than the prior arrangement between David and Michael.

36.     Enticed by both the ownership offer and the opportunity it gave him to reap the rewards of his online abilities, Mr. Shiel accepted the offer of becoming an "equal owner" and receiving 33% of the profits of the Company and agreed to purchase the CoolFrames.com website, domain name and associated IP from Michael, and then develop the online business.

37.     Ostensibly to save time and money, but in reality to facilitate the deception of Plaintiff, it was proposed that David's wife, Renata, an experienced corporate attorney, would prepare a Purchase Agreement and represent Plaintiff in the asset purchase from Michael.

38.     In an email to both Plaintiff and Michael on November 6th, 2014, Renata made clear in no uncertain terms that she was representing Mr. Shiel, and not the Company or David, in the purchase of CoolFrames.com and its intellectual property.

39.     Renata then prepared successive drafts of a Purchase Agreement implementing the first step in Defendants' scheme.  Renata's initial draft clearly identified Plaintiff as the Purchaser.

40.     David participated in the drafting of the Purchase Agreement and stated unambiguously that the Plaintiff (Kevin) was purchasing the CoolFrames.com intellectual property.   David personally reviewed the drafts of the Agreement, carefully checking for typos and even correcting the spelling of Plaintiff's name, but never suggesting that Plaintiff would not be the purchaser.  Indeed, in an email accompanying his changes, David stated "we need to put something along thelines *[sic]* of – the day of **transfer to kevin** [emphasis added] . . . every detail from the past is transfered *[sic]*", and stressed "kevin is not [only] buying the rightsfrom *[sic]* mike **he is buying his code** [emphasis added] and with this purchase mike nolonger *[sic]* has any access."  David underscored that the Agreement needed to be finalized immediately.

41.     After receiving David's proposed changes, Renata quickly prepared an updated version of the Purchase Agreement, with Plaintiff's name spelt properly, and maintaining his name as the Purchaser.

42.     With David, Renata, and Plaintiff in agreement that Plaintiff would personally purchase the CoolFrames.com domain name, website, and all associated IP from Michael for $250,000, Renata sent Plaintiff a final version of the agreement to sign.

43.     However, in this final version, acting at David's direction, with Lee's knowledge and approval, but without explaining the change to Plaintiff, or signaling that she had done anything in any way significant, Renata surreptitiously changed the identity of the Purchaser from "Kevin Shiel" to "CoolFrames LLC", while keeping the signatory as "Kevin Shiel" and identifying him as "President of CoolFrames LLC."

44.     David, Lee, or Renata never gave any indication that the last minute change would be used to claim that Plaintiff was not purchasing the CoolFrames website, domain name, code and IP, but was merely acting – with a quarter of a million dollars of his own funds – as the Company's agent.

45.     Plaintiff was too young and inexperienced to understand the deviousness of Defendants' scheme and fully believed David and Renata, who had claimed she was representing Plaintiff and his interests only, when they told him that the agreement was standard and fully consistent with the agreement Plaintiff had entered into with Defendants, through which Plaintiff would purchase the CoolFrames' website and IP and take Michael's position as David's partner.

46.     To create a paper trail consistent with their scheme, David and Renata convinced Plaintiff to wire his funds directly to David's "Westfield Group" business account, from which David would complete the final transfer.   David's purpose in arranging this convoluted payment structure was to defraud Plaintiff further by claiming Plaintiff was simply funding the purchase on David's and Lee's behalf.

47.     However, acting with the full knowledge and approval of David (whose account was being used) and Lee (who would profit from the scheme), Renata fraudulently explained the use of David's account as resulting from alleged limitations on international wire transfers that required funds to transit through David's account, rather than her Escrow account.  Renata minimized the importance of using David's account and simply told Plaintiff,   "Transfer it [the quarter of a million dollars] to David's [account] and he'll transfer it to mine."

48.     At no time, did Renata, David, or Lee ever suggest that the temporary use of David's unrelated business account meant that Plaintiff was using his own money to purchase the

CoolFrames IP on David's behalf. Plaintiff made the payment fully believing he was purchasing the IP for himself.

49.     Little did Plaintiff know that Defendants plan was to steal his $250,000, pay him token amounts in "profits" payments, induce him to turn-around and grow the business, claim Plaintiff purchased the IP for them, and then leave him with literally nothing at the end.

### MR. SHIEL DRAMATICALLY INCREASES COOLFRAMES REVENUES

50.     Immediately after his $250,000 purchase, Plaintiff completely revamped the CoolFrames website, its product presentation, and marketing strategy. Conversion rates on the website almost immediately exploded and within months of Plaintiff's taking over, CoolFrames' revenues began to grow sharply.

51.     In 2014, the legacy CoolFrames business generated revenues of approximately $2,000,000. By 2015, after a little over a year under Plaintiff's management, revenues increased 50% to $3,000,000.

52.     Because the initial increased revenues were achieved with virtually no additional expenditures – resulting almost exclusively from Plaintiff's investment of his own time and efforts – and as the gross profit margin in the eyewear business is very high – on the order of 80% –  the increased revenues largely flowed through directly to CoolFrames' bottom line. In addition, the business had previously been wastefully structured, so that the "true" profits now available to CoolFrames from Plaintiff's management were well in excess of $1,000,000.

53.     In 2016, Mr. Shiel hired additional staff members and contractors, growing the business further, and in 2016 sales grew to approximately $4 million. The increased headcount added to the Company's expenses, but the profits of the business continued to grow. Based on his knowledge of costs of goods sold, sales, marketing and shipping costs, and salary expense,

Plaintiff calculates that the "true" net profits of the business were equal to at least $1 million. Thus, the cumulative profits of the business in the first two years of Mr. Shiel's management were likely over $2 million. However, during these two years, based on fraudulent accounts used by David, Lee and Renata to justify their fraud, the Company only reported a fraction of its true profits and only paid Plaintiff a small fraction of that. Of the $660,000 to which he was entitled for the 2015 and 2016 period, Plaintiff only received a total of $150,000. In effect, he had purchased the Company IP, doubled the sales of the business, dramatically increased its profits, and was still $100,000 under water.

54. Meanwhile, Defendants embarked on a spending spree, using the increased profits to fund their own "nouveau riche" lifestyles. Plaintiff learned of these extravagant expenses because he saw copies of Defendants' corporate credit card statements and knew from his own experience that it was impossible for the business to be making as little as Defendants claimed it was making, given its low cost structure and the unique nature of the CoolFrames business model, which eliminated the need to keep expensive inventory on hand.

55. Revenue was flat in 2017, but picked up again the following year, growing to $4.5 million by the end of 2018. During these two years, Plaintiff believes the business generated at least an additional $1.7 million in net profits on total revenues of $8.5. million.

56. As the business grew, Defendants became more and more aggressive in taking advantage of Plaintiff. Without informing him, Defendants transformed CoolFrames LLC into CoolFrames Inc., to prevent Plaintiff from claiming an ownership interest in the Company, since non-U.S. foreign residents cannot be owners of U.S. Subchapter S corporations. Defendants then reduced payments to Plaintiff even as business expanded, sending him wire transfers of funds

completely out of proportion to the business' actual profitability, and communications with false and fraudulent statement claiming the business was experiencing difficulties.

57.     As an indication of Defendants aggressively fraudulent activity, on April 3, 2017 Defendants made a monthly profits interest payment of $5,000 to Plaintiff, <u>one third</u> the monthly amount that had been paid on January 12, 2016, even though the business had nearly doubled in sales between these two dates.   On information and belief, CoolFrames' actual profits for the period covered by the $5,000 payment exceeded $100,000 and Plaintiff was entitled to a payment of at least $33,000 for this period.

58.     Defendants justified the token payments to Plaintiff in a series of increasingly implausible and outright fraudulent communications.  In September 2017, Lee claimed that Plaintiff was not receiving the profits to which he was entitled because "we were in a f*** hole and we're climbing out of it; it has been terrible man," as though Plaintiff were responsible for David's and Lee's incompetence in managing the Company's finances for the period before he took over the operations of CoolFrames on-line business.  In response to Plaintiff's increasingly insistent demand for an explanation for the implausibly low payments he was receiving, Lee repeatedly pushed Plaintiff off, telling him, "I will explain everything.  Please don't think there is anything dishonest going on" and then refusing to provide the necessary accounting detail.  In October 2017, Lee even blamed the outrageously low payments to Plaintiff on his drinking problem, stating "I mean how much can a person drink daily," and on his financial incompetence, saying, "The only funny accounting going on is that I'm doing it." In reality, Lee knew perfectly well what he and David were doing.  Lee's colorful language would probably best describe what they were intentionally doing to Plaintiff.  In nearly half of the months between December, 2014, and January, 2019, Defendants <u>entirely</u> stopped making payments to

Plaintiff, manipulating the accounts to keep **100%** of the millions of dollars in revenues generated by Plaintiff for themselves.

59.     From 2015 to 2019, Defendants made over 20 fraudulent wire transfers and sent over 10 text messages and emails falsely claiming that Mr. Shiel was receiving the moneys to which he was entitled.

## THE MAGNITUDE OF DEFENDANTS' SCAM

60.     Plaintiff did not know, and still does not know, the full extent of Defendants' unlawful and fraudulent behavior.  However, based on his in-depth knowledge of the business, and the key metrics of its financial performance, he knew that the payments he was receiving did not and could not represent 33% percent of the profits of the business.

61.     During the period of Mr. Shiel's management of the business, from December, 2014 through January, 2019, CoolFrames generated approximately $15,500,000 in revenues, virtually all of it from the online business operated and managed by Plaintiff.

62.     The total payments to Plaintiff from CoolFrames over this four-year period amounted to approximately $290,000.  Since Plaintiff paid $250,000 for the CoolFrames IP, his net return for 4 years work, during which he more than doubled revenues, was $40,000.  This amounts to compensation of $10,000/year and zero return on equity for a person Defendants themselves concede was the "President" of the Company and its operational manager for four years.

63.     Looked at somewhat differently, using Defendant's calculations, Defendants were necessarily claiming that profit margins from CoolFrames, an online business with minimal expenses and no need to keep inventory, are an absurdly low 6%.

64.     As a point of comparison, the previous owner of the CoolFrames.com website and David's former partner earned 5% on all revenue up to $85,000/month, and 10% on all revenues over $85,000/month.  Assuming the same metrics with the revenues generated by Plaintiff, Mr. Shiel would have been entitled to payments of approximately $1.1 million.

65.     These numbers can only be explained by a massive diversion of Company funds to Defendants for unjustified personal expenses, unrelated business ventures, phony salary payments to family and friends, "bonuses" based on Plaintiff's success and other similar devices used to defraud a distant partner with no access to the Company books and records.

66.     In addition, the value of the CoolFrames IP has increased by many multiples of the initial purchase price.   In recent years, the online eyewear business has been one of the most dynamic in the Internet e-commerce space, creating a new "unicorn," Warby Parker, with a pre-IPO valuation of $1.7 billion.

See https://www.vox.com/2018/3/14/17115230/warby-parker-75-million-funding-t-rowe-price-ipo.  et, as a result of Defendants' scheme, and as described below, Plaintiff has been left with **nothing**—no value whatsoever for a website he purchased and a business he developed and grew.

67.     The CoolFrames IP purchased by Plaintiff is worth today, at an absolute minimum, $750,000, and likely many multiples of that.

68.     Faced with the magnitude of Defendants' scam, which resulted in him being denied any payments at all in certain months despite millions of dollars in revenue, and believing in good faith that he was a 50% owner of CoolFrames, with the same authority over payments as David, Petitioner reserved a portion of the revenues he generated to cover his profit share, still

leaving a shortfall of at least $600,000, not counting the value of the IP purchased in the initial asset purchase transaction.

## DEFENDANTS IMPLEMENT THE FINAL PHASE OF THEIR SCHEME TO DESTROY THE VALUE OF PLAINTIFF'S INVESTMENT

69.     In early January, 2019, David and Lee, acting with the knowledge and approval of Renata, who as David's wife and attorney would benefit from the scheme, decided to exclude Plaintiff completely from the Company.

70.     To implement the final phase of their scheme, David and Lee came up with a ruse that David had been "hacked" and that this supposed "hacker" had access to every single account username and password that David had ever used.  Allegedly as a result of this hack, David and Lee needed to hire a security expert who would take control of all the Company accounts, including those that belonged to and were used by Plaintiff, change all passwords and "clear out" any malware planted in the Company's software systems.

71.      David promised Plaintiff that the process would only take a few days and that all passwords for the CoolFrames IP would be returned to him.

72.     Plaintiff accordingly surrendered all access to his accounts, giving Defendants total access to his computer systems, the CoolFrames website, its domain name accounts, software code, and all related and associated professional accounts.

73.     However, once Defendants had control of Mr. Shiel's passwords, they modified all of the Company accounts and locked him out of the business.

74.     To paper over their illegal attempt to appropriate the full value of CoolFrames for themselves and leave Plaintiff left with nothing, after the lock-out, David and Lee incredibly sent Plaintiff a demand letter bordering on extortion and blackmail, threatening to ruin his reputation

and future career prospects unless he paid **them** the sum of $500,000 immediately, when

Defendants in fact owe <u>Plaintiff</u> at least hundreds of thousands (and possibly millions) in unpaid

profits and the full value of the IP he had purchased for $250,000.

## FIRST CAUSE OF ACTION
### Violation Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)

75.     Plaintiff repeats and realleges each and every foregoing allegation as though set

forth in detail herein.

76.     CoolFrames, LLC was a "racketeering enterprise" as that term is defined in 18

U.S.C. § 1961(4) that engaged in activities which affect interstate commerce and had a common

purpose of stealing from Mr. Shiel, obtaining financial concessions from him and depriving him

of the rewards of his investment and efforts.

77.     Defendants are individuals and entities that have knowingly conducted and/or

participated in, directly or indirectly, in the racketeering enterprise through a pattern of

racketeering activity consisting of at least two predicate acts predicate acts of mail and wire fraud,

18 U.S.C. §§ 1341 and 1343.

78.     Defendants' enterprise was a racketeering activity because it existed for the

improper and illegal purpose of harming Mr. Shiel and fraudulently depriving him of the funds,

the assets, and the fruits of his labor to which he was entitled.

79.     Plaintiff has been injured in his business and property by reason of the above-

described conduct in that he has suffered reputational damage, has been forced to devote thousands

of hours of his time to growing a business without receiving the agreed economic benefit, has been

denied at least hundreds of thousands in earned profits, and has been deprived of an interest in a

business worth many millions of dollars.

80. By reason of his injury, Mr. Shiel is entitled to treble damages of an amount to be determined at trial, but believed to be no less than $2,000,000, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## SECOND CAUSE OF ACTION
### Violation of Computer Fraud and Abuse Act - 18 U.S.C.A. § 1030

81. Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

82. Plaintiff's computer and computer equipment through which he accessed the CoolFrames' website was a protected computer within the meaning of 18 U.S.C.A. § 1030(e)(2)(B) used in or affecting interstate or foreign commerce.

83. Defendants accessed Plaintiff's computer, computer equipment and/or emails without authorization or authority, including by falsely representing that they were taking action to combat an alleged "hacker."

84. Following Defendant's unauthorized accessing of Plaintiff's computer and computer equipment, Defendant's misappropriated the entirety of the CoolFrames IP Plaintiff had purchased.

85. Plaintiff suffered damages and loss from such unauthorized access and misappropriation in that he was effectively shut out and lost the value of assets and a business he had purchased and developed, was prevented from exercising his functions as President of the Company and was cut off from marketing, investor, networking and other corporate communications to which he had previously had access, all of which caused Plaintiff to suffer harm and damage to his interest in the Company and his professional livelihood.

86. As a result of the foregoing, Plaintiff has suffered damages in an amount to be determined at trial but believed to be no less than $1,000,000.

## THIRD CAUSE OF ACTION
### Violation of Stored Communications Act - 18 U.S.C.A. § 2701

87.     Plaintiff repeats and realleges the foregoing allegations as if set forth fully herein.

88.     Defendants intentionally accessed without authorization the facilities through which CoolFrames electronic communication services are provided, as any such access required the approval of the President of the Company and the owner of its IP.

89.     Such approval as was given by Plaintiff was based on fraudulent misrepresentations and was not authorized.

90.     Defendants then obtained, and prevented Plaintiff from obtaining, access to electronic communication of the Company while in electronic storage, namely Plaintiff's corporate email account, CoolFrames website management credentials, software code, and domain name registration information, and then permanently locked Plaintiff out of all CoolFrames accounts.

91.     David's and Lee's conduct was committed for purposes of commercial advantage, malicious destruction or damage, and/or private commercial gain in that David and Lee sought to get sole access to the Companies' accounts so that they could operate and manage the Company's online business without authority or authorization, and misappropriate the CoolFrames IP Plaintiff had purchased, all in violation of Plaintiff's rights and the agreement between the parties.

92.     As a result of David's and Lee's conduct, Plaintiff lost the value of assets and a business he had purchased and developed, was prevented from exercising his functions as President of the Company and was cut off from marketing, investor, networking and other corporate communications to which he had previously had access, all of which caused Plaintiff to suffer harm and damage to his economic interests and his professional livelihood.

93.     Under 18 U.S.C.A. § 2707(b)(2) and (3), Plaintiff is entitled to damages in an amount to be determined at trial but believed to be no less than $1,000,000, together with attorneys' fees and costs.

94.     David's and Lee's conduct was willful, intentional, malicious, totally unauthorized and taken in the most extreme bad faith and Plaintiff is entitled to an award of punitive damages under 18 U.S.C. § 2707(c).

## FOURTH CAUSE OF ACTION
### Breach of Contract

95.     Plaintiff repeats and realleges each and every foregoing allegation as though set forth in detail herein.

96.     With the explicit confirmation of Lee and the active participation of Renata, David offered Plaintiff equal ownership of a company to be created, which the parties all agreed would be called CoolFrames LLC, and David and Lee, with the knowledge and acquiescence of Renata, offered Plaintiff 33% of the profits interest in the new company, in exchange for Plaintiff agreeing to purchase the CoolFrames.com website and associated IP from David's previous partner for $250,000 and contributing his Internet marketing skills to growing the business (the "Offer").

97.     Plaintiff accepted the Offer both orally and by performing his part of the bargain, paying $250,000 for the CoolFrames website and IP, and contributing his skills, time and experience to the Company, increasing the Company's customer base, revenues and profits, thereby creating an enforceable contract (the "Agreement").

98.     David, Lee and Renata breached the Agreement by failing to provide Plaintiff with the 33% contractually agreed profits interest, failing to execute an operating agreement memorializing the parties' agreement that Plaintiff would be an "equal owner," transforming

CoolFrames LLC into CoolFrames Inc., a subchapter S corporation, without Mr. Shiel's knowledge or consent, and ultimately depriving Plaintiff from having any interest in the Company.

99.     Plaintiff has been harmed as a direct and proximate result of Defendants' breaches of contract and Plaintiff is entitled to its damages in an amount to be determined at trial, but believed to be no less than $2,000,000.

**FIFTH CAUSE OF ACTION**
**Fraudulent Misrepresentation**

100.     Plaintiff repeats and realleges each and every forgoing allegation as if fully set forth herein.

101.     David and Lee had no intention of performing their obligations under the Agreement and only made the Offer to provide Defendants with cover to carry out the racketeering scheme described above.

102.     David and Lee willfully, intentionally and falsely represented to Plaintiff that Plaintiff would become a 50% member of CoolFrames LLC and would receive 33% of the profits of the Company.  Ms. Weissman also intentionally and falsely represented to Plaintiff that his funds were being used to finance the purchase by him of the CoolFrames intellectual property and that he would be included as one of two members of a two-member LLC.

103.     Plaintiff reasonably and justifiably relied on Defendants' representation that he would become a 50% member of CoolFrames LLC and would receive 33% of the profits of the Company, since David and Lee were older, more experienced businessman, and Renata was a corporate attorney who promised she would represent Plaintiff's interests, and Plaintiff had no reason to believe Defendants were lying.

104.     Renata knew of and approved David's representations, knew that Plaintiff would reasonably rely thereon and acted to support and reinforce David's and Lee's representations.

Renata prepared a draft operating agreement showing Plaintiff as a 50% owner in order to induce Mr. Shiel to believe he had been made a genuine offer.

105. Plaintiff suffered proximate damages from his reasonable reliance on Defendants' misrepresentations in that he was swindled out of $250,000, was not paid the sums he reasonably anticipated receiving, has been deprived of a membership interest in a business worth millions of dollars and lost the opportunity to devote over four of his most productive years to other ventures where he would have received an appropriate return on his exceptionally valuable human capital.

106. As a result, Defendants are liable to Plaintiff for damages and losses resulting from their fraudulent misrepresentations in an amount to be determined at trial, but believed to be no less than $2 million, together with an award of attorney's fees and punitive damages.

## SIXTH CAUSE OF ACTION
### Fraudulent Inducement

107. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

108. Defendants made and/or participated in making the Offer in order to induce Mr. Shiel to transfer $250,000 to David's "Westfield Group" account on false pretenses, and then to invest his exceptional human capital in developing, operating and managing the CoolFrames' business for Defendants', and not his own, benefit.

109. Plaintiff relied on the false promises contained in the Offer and acted to accept the Offer by performance fully expecting that he would become a 50% owner and receive 33% of the profits of the business.

110. Plaintiff suffered proximate damages from his reliance of Defendants' false promises in that he was fraudulently induced to invest $250,000 for an ownership interest to which Defendants subsequently denied he had any entitlement, did not receive the profits payments owed to him, and incurred the very significant opportunity costs of foregoing other, multi-million dollar

opportunities available to an individual of his talent and track record.  Indeed, Mr. Shiel's career has been irreparably tarnished, because, instead of being considered the owner of CoolFrames and the strategic "brains" of its remarkable success, he has been publicly portrayed as a mere "contractor" with no high-level involvement in the Company's explosive growth over the past 5 years—whereas, in reality, he was responsible for responsible for the Company's growth and is the victim of a callous financial scam.

111.    As a result of the foregoing, Defendants are liable to Plaintiff for damages in an amount to be determined at trial, but believed to be no less than $2 million, together with punitive damages and attorney's fees.

## SEVENTH CAUSE OF ACTION
### Fraud in the Factum

112.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

113.    David and Renata fraudulently misrepresented, in affirmations and omissions, that the Purchase Agreement would give Plaintiff ownership of the CoolFrames website and associated IP.  Lee knew of, acquiesced in, and approved David and Renata's fraudulent misrepresentations.

114.    Plaintiff relied on David's and Renata's fraudulent misrepresentations and signed the Purchase Agreement believing it was an agreement through which he was personally purchasing the CoolFrames website and associated IP.

115.    Defendants now maintain that Plaintiff was merely acting as David's and/or their agent and has no rights in the CoolFrames website and associated IP.

116.    Had Plaintiff been told of Defendants' position that he was only executing the Purchase Agreement as an agent of the Company and would have no rights in the intellectual property purchased, Plaintiff would not have executed the Purchase Agreement, would not have

paid $250,000 and would have been able to invest such funds in other ventures, would not have devoted four years of his life to developing the value of business whose intellectual property he did not own.

117. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, but believed to be no less than $1,000,000, together with an award of attorneys' fees and punitive damages.

## EIGHTH CAUSE OF ACTION
### Promissory Estoppel

118. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

119. David and Lee made a clear, definite and unambiguous promise that Plaintiff would receive a 50% membership interest and 33% profits interest in the Company.

120. Plaintiff reasonably, foreseeably and detrimentally relied on David's and Lee's definite promise that Plaintiff would receive 50% of the ownership interest in the Company and a 33% profits interest.

121. David's and Lee's definite promise was made with the knowledge and approval of Renata.

122. As a result, Defendants are liable to Plaintiff for the damages in an amount to be determined at trial, but in no event less than $250,000 paid for the purchase of the company website and IP, a reasonable return on such funds for an entrepreneur with Plaintiff's track record and the full value of four years of Plaintiff's time and efforts, such amounts to be determined at trial, but believed to be no less than $1,000,000

## NINTH CAUSE OF ACTION
### Unjust Enrichment

123. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

124.     Defendants have been immensely enriched by Plaintiff's work in building CoolFrames, in that CoolFrames is now worth many times what it was worth when Plaintiff made his initial investment.   Defendants were not only enriched by the boom in sales generated by Plaintiff and the increased cash available for their own self-dealing purposes, but also by the overall increase in the value of the business, which Plaintiff believes is likely valued at many multiples of profits today.

125.     E-commerce businesses, of the age and proven track record, and showing the type of growth exhibited by CoolFrames as a result of Plaintiff's efforts, are typically sold at a multiple of 3x - 6x net profits today. A unique business in a booming sector such as CoolFrames may even sell for 2x - 3x annual revenue.  Assuming CoolFrames generated $1 million in profits in 2019, CoolFrames value is equal to at least $3 million, immensely enriching Defendants, who did nothing to increase the value of the business, or use their own funds to acquire the CoolFrames IP, which generates at least 95% of the Company's revenue.

126.     Defendants' enrichment has come at Plaintiff's expense, since he purchased the website and IP initially from Michael, was responsible for the growth in value of the business, but has been deprived of his initial investment, the payments to which he was entitled and the full value of his interest in the Company.

127.     It would be against equity and good conscience to permit Defendants to remain enriched at Plaintiff's expense in that Plaintiff developed a business from which Defendants have immensely profited and Defendants have lied to, deceived and manipulated Plaintiff, a much younger entrepreneur with little experience in contract negotiation and equity investment, in order to reap the benefits of his capital, his knowledge of online sales and marketing, and his investment of years of his life in growing the CoolFrames business.

128.    Defendants are therefore liable to Plaintiff for compensatory damages in an amount to be determined at trial but believed to be no less than $5,000,000.

## TENTH CAUSE OF ACTION
### Breach of Fiduciary Duty

129.    Plaintiff repeats and realleges each and every foregoing allegation.

130.    As someone to whom an ownership interest in CoolFrames had been promised and who was entitled to a share in the profits of the Company, and someone who was responsible for managing the Company's operations, Plaintiff stood in a relationship of trust with David, Lee and Renata, who owed him a fiduciary duty in overseeing the Company's finances, calculating and distributing the Company's profits and avoiding self-dealing and conflicts of interest. Renata expressly represented to Plaintiff that she was acting in his interests in the transaction with Michael that was to lead to his ownership interest in CoolFrames and was supported in her representations by David and Lee.

131.    Plaintiff was entitled to place his trust and confidence in David, Lee and Renata to act with the utmost good faith in managing the finances of CoolFrames and distributing its profits.

132.    Plaintiff relied on David's, Lee's and Renata's reputation for loyalty and integrity, and their professional qualifications, and had no reason to believe they would not perform their duties and responsibilities towards him.

133.    David, Lee and Renata took advantage of Plaintiff's faith in them by not performing their duties to Plaintiff, by acting in a manner ridden by conflict of interest, as evidenced by their self-dealing and self-enrichment, and their manipulation of the financial accounts of the Company to finance their lavish lifestyles.

134. David, Lee and Renata knowingly and willingly breached their duty of loyalty to Plaintiff by scheming to deceive and defraud Plaintiff, deprive him of the benefit of his financial and sweat equity investment in the Company, and to enrich themselves at Plaintiff's expense.

135. Plaintiff has been harmed as a direct and proximate result of David's, Lee's and Renata's breaches of fiduciary duty and Plaintiff is entitled to its damages in an amount to be determined at trial, but believed to be no less than $2,000,000, together with an award of damages and attorneys' fees.

### ELEVENTH CAUSE OF ACTION
### Breach of covenant of good faith and fair dealing

136. Plaintiff repeats and realleges each and every foregoing allegation

137. The Agreement between David and Plaintiff, which was supported and approved by the other Defendants, created a duty of good faith and fair dealing towards Plaintiff on the part of Defendants.

138. Defendants breached their duty of good faith and fair dealing by deliberately lying to Plaintiff about their intentions to provide him with the agreed compensation for his investment of time in building the business, preventing Plaintiff from obtaining the benefits of the Agreement, denying him fair compensation and his share of the Company's profits for his efforts in building the business, locking him out of CoolFrames' accounts, and threatening and intimidating him in an attempt to prevent him from protecting his interests.

139. Defendants are liable to Plaintiff for compensatory damages resulting from Defendants' breach of their duty of good faith and fair dealing toward Plaintiff in an amount to be determined at trial, but believed to be no less than $1,000,000, and are further liable for punitive damages resulting from such breach of duty.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure § 38(b), Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff demands judgment;

(1)     On his First Cause of Action for violations of RICO, compensatory damages in an amount to be determined at trial but believed to be no less than $2,000,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c);

(2)     On his Second Cause of Action for violation of the Computer Fraud and Abuse Act, for compensatory damages in an amount to be determined at trial, but believed to be no less than $1,000,000;

(3)     On his Third Cause of Action for violation of the Stored Communications Act, for compensatory damages in an amount to be determined at trial, but believed to be no less than $1,000,000, together with an award of attorneys' fees and punitive damages pursuant to 18 U.S.C. § 2707(c).

(4)     On his Fourth Cause of Action for Breach of Contract, compensatory damages in an amount to be determined at trial, but believed to be no less than $2,000,000;

(5)     On his Fifth Cause of Action for Fraudulent Misrepresentation, compensatory damages in an amount to be determined at trial, but believed to be no less than $2,000,000, together with punitive damages, costs and attorneys' fees;

(6)     On his Sixth Cause of Action for Fraudulent Inducement, compensatory damages in an amount to be determined at trial, but believed to be no less than $2,000,000, together with punitive damages, costs and attorneys' fees;

(7)     On his Seventh Cause of Action for Fraud in the Factum, compensatory damages in an amount to be determined at trial, but believed to be no less than $1,000,000, together with punitive damages, costs and attorneys' fees;

(8)     On his Eighth Cause of Action for Promissory Estoppel, compensatory damages in an amount to be determined at trial, but believed to be no less than $1,000,000;

(9)     On his Ninth Cause of Action for Unjust Enrichment, compensatory damages in an amount to be determined at trial, but believed to be no less than $5,000,000;

(10)    On his Tenth Cause of Action for Breach of Fiduciary Duty damages in an amount to be determined at trial, but believed to be no less than $2,000,000, together with punitive damages, costs and attorneys' fees;

(11)    On his Eleventh Cause of Action for Breach of the Covenant of Good Faith and Fair Dealing, damages in an amount to be determined at trial, but believed to be no less than $2,000,000, together with punitive damages, costs and attorneys' fees;

(12)    A declaratory judgment that Plaintiff is entitled to 33% of the profits of CoolFrames, Inc. during the life of the Company;

(13)    An injunction prohibiting Defendants from selling all or any portion of CoolFrames, Inc. until Plaintiff's claims have been satisfied; and

(14)    Such other relief as the Court deems just and proper.

Dated: New York, New York,
      December 10, 2019          **QUAINTON LAW, PLLC**
                                   1001 Avenue of the Americas, 11th Floor
                                   New York, New York 10018
                                   (212) 813-8389
                                   *Attorneys for Plaintiff Kevin Shiel*

                                   By:  */s/ Eden P. Quainton*           

                                   EDEN P. QUAINTON, ESQ.